# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

CARL EARSKIN HOLT,

      Petitioner,

v.                                        Case No. 3:19-cv-1345-TJC-PDB

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## ORDER

## I.  Status

Petitioner, Carl Earskin Holt, an inmate of the Florida penal system, initiated this action on November 14, 2019, by filing a pro se Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (Doc. 1) and a memorandum of law in support of his Petition (Doc. 3). Before Respondents filed their response to the Petition, Petitioner moved to stay these proceedings and hold them in abeyance until the resolution of a state court postconviction motion Petitioner filed with the trial court in April 2020. Doc. 9. The Court granted Petitioner's request and stayed this case pending resolution of Petitioner's pending state court motion. Doc. 10. Once his successive state proceedings concluded, Petitioner filed with this Court a motion for leave to file a supplemental petition

raising another six grounds for relief. Doc. 26. The Court granted Petitioner's motion, directed the Clerk to file Petitioner's Supplemental Petition, but clarified that in doing so, it expressed no opinion as to the timeliness, procedural correctness, or merits of the claims raised in the Supplemental Petition. Doc. 27. The Supplemental Petition (Doc. 28) and supplemental memorandum of law (Doc. 29) were then filed on July 1, 2022. In the Petition and Supplemental Petition, Petitioner challenges a state court (Duval County, Florida) judgment of conviction for which he is serving a cumulative forty-year term of incarceration with a twenty-five-year minimum mandatory term. Respondents filed a Response, see Doc. 31 (Resp.), with exhibits, see Docs. 32-1 to 32-27 (Resp. Ex.). Petitioner filed a Reply. See Doc. 38. This case is ripe for review.[1]

## II.    **Governing Legal Principles**

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v.

---

[1] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. The Court finds that "further factual development" is unnecessary. Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of

the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

4

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim.

> Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan
> v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144
> L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman,[2] supra, at 747–748, 111 S. Ct. 2546; Sykes,[3] supra, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal

---

[2] Coleman v. Thompson, 501 U.S. 722 (1991).

[3] Wainwright v. Sykes, 433 U.S. 72 (1977).

> review of a defaulted claim by showing cause for the
> default and prejudice from a violation of federal law.
> See <u>Coleman</u>, 501 U.S., at 750, 111 S. Ct. 2546.

<u>Martinez v. Ryan</u>, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. <u>Ward v. Hall</u>, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective
> factor external to the defense that prevented [him] from
> raising the claim and which cannot be fairly
> attributable to his own conduct." <u>McCoy v. Newsome</u>,
> 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting <u>Carrier</u>,
> 477 U.S. at 488, 106 S. Ct. 2639).[4] Under the prejudice
> prong, [a petitioner] must show that "the errors at trial
> actually and substantially disadvantaged his defense
> so that he was denied fundamental fairness." <u>Id.</u> at
> 1261 (quoting <u>Carrier</u>, 477 U.S. at 494, 106 S. Ct. 2639).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the

---

[4] <u>Murray v. Carrier</u>, 477 U.S. 478 (1986).

continued incarceration of one who is actually innocent, otherwise would result.

The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

## C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's

performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

Notably, there is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

"The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." Knowles

9

v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105. As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting Strickland, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." Id. (citing Richter, 562 U.S. at 105); see also Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004).

### III.    **Factual and Procedural History**

The state charged Petitioner with two counts: conspiring with Sean Gunville and Ronald Brock to knowingly sell, purchase, manufacture, deliver or bring into the state more than 28 grams of heroin (count one); and conspiring with Jason Baker and Kristopher Harris to unlawfully sell, manufacture, or deliver heroin (count two). The information alleged the offenses occurred between July 19 and November 8, 2012. The counts were consolidated for trial. The following summary of the trial proceedings is taken from Petitioner's initial

brief filed on direct appeal:

Special Agent Nathan Koen worked for the Drug Enforcement Administration. Koen testified as to the terminology used by people involved in dealing heroin, and stated that an ounce of heroin was worth about $3500 to $4000. An ounce contained 28 grams. . . .

Agent Koen testified as to how the hierarchy of drug organizations worked: the supplier, the purchaser, and the people who actually sold it on the streets. To investigate drug organizations, it was customary for law enforcement to wiretap cell phones. Permission to wiretap a phone required a written probable cause [affidavit] which was reviewed by a state attorney and ultimately approved by a judge.

In reference [to] this case, Koen testified he used Jeremiah Levy as a confidential informant, who was referred to him by the sheriff's office. Through Levy, law enforcement was able to make three purchases of heroin from Sean Gunville. The purchases took place on July 19 and 23, and on August 1, 2012. During all of the controlled buys, Levy was searched and was equipped with a recording device and was followed by law enforcement to the meeting locations. All of Levy's interactions with Gunville were recorded and videotaped. After the purchases, Levy returned and met with Koen. Levy turned over the narcotics he purchased from Gunville, and the recording device. The heroin obtained during the three purchases was introduced into evidence.

During the July 23rd meeting between Levy and Gunville, Koen observed [Petitioner]. According to Koen, [Petitioner] was acting as a counter surveillance. [Petitioner] arrived in a separate car and circled the parking lot where Levy and Gunville met. After the transaction ended, [Petitioner] simply followed Gunville's car and left the area.

In addition to assisting with setting up the three transactions between Levy and Gunville, Koen prepared a probable cause affidavit and obtained permission to wiretap [Petitioner's] and Gunville's phone. [Petitioner's] cell was monitored for approximately 30 days. Through monitoring his phone, Koen

learned Ronald Brock was [Petitioner's] supplier, and that there were several individuals involved in the sale of heroin . . . .

Koen also learned [Petitioner] had two houses. One was located on Ricky Drive and the other one on Loretto Road. [Petitioner] had no other meaningful source of employment other than selling drugs. Over objection, some of the intercepted calls were introduced and published to the jury. One was a call from August 15th, and six were from August 16, 2012, at various times. Koen identified [Petitioner] and Ronald Brock as the two persons in the phone calls. Koen stated that after the arrest he talked to [Petitioner] and therefore could identify his voice in the phone calls. Likewise[,] and using the same method, he was able to say the other person was Ronald Brock.

Based on the conversations, Koen determined [Petitioner] planned to sell five ounces of heroin on August 16, 2012, and needed to get heroin from Brock. According to Koen during the conversations, Brock suggested the transaction needed to take place in the open such in a restaurant. [Petitioner] and Brock eventually met at a CVS. Brock exited his car, and [Petitioner], accompanied by Gunville, did the same. However, the planned transaction did not take place in the open, and a robbery took place. [Petitioner] and Brock were upset.

Two additional intercepted calls from August 17, 2012, were introduced and published to the jury. Koen analyzed the phone calls and testified that [Petitioner] and Brock were blaming Gunville for the loss of the heroin (during the robbery). According to Koen, [Petitioner] and Brock wanted Gunville to have the drug debt paid by relatives. The debt was estimated at $19,000. [Petitioner] wanted to get the thief with a firearm, however, Brock wanted to concentrate in getting the drug debt paid because he (Brock) had a good supplier.

There were four August 29, 2012, intercepted phone calls. During the first phone call, Anthony Riley, Brock's supplier was introduced. Koen testified Riley's phone was wiretapped and after the case, he talked to Riley and therefore was able to identify his voice in the phone calls. According to Koen, during the phone calls between Brock and [Petitioner], Brock advised [Petitioner] he

talked to his supplier Riley who indicated everything would be fine as long as the money owed was paid. More[o]ver, according to Koen, there was a discussion about getting additional heroin from his source and also discussions about Brock and [Petitioner] meeting to obtain the new supply of heroin. Koen and law enforcement surveilled the meeting between [Petitioner] and Brock on August 29, 2012. The meeting was videotaped and published to the jury. Koen explained the video and stated that during it, [Petitioner] exited his Cadillac and entered Brock's burgundy Altima.

By September[] 2012, [Petitioner] and Brock started to plan another meeting. Several attempts were made to finally meet up, but for this meeting [Petitioner] drove his red orange Chevy pickup and Brock drove a Chevy Silverado. [] [T]he meeting was videotaped and introduced into evidence. During the several subsequent phones calls between [Petitioner] and Brock, law enforcement learned that [Petitioner] and Brock were going to meet again, that Brock's supplier was happy with the repayment of the old debt, and that [Petitioner] had about $3000 for an ounce of heroin. The subsequent meeting between Brock and [Petitioner] was also videotaped and published to the jury. [Petitioner] drove his white Cadillac and Brock a Ford pick up truck.

Over objection, the state introduced a telephone call between [Petitioner] and his wife. According to Koen, [Petitioner] called his wife Jamecia Holt. Present during the phone call was Joseph Kowalski. [Petitioner] talked with his wife and asked her to check how much of the drugs he had left.

Jeremiah Michael Levy testified consistent with Special Agent Koen, and confirmed that he assisted law enforcement to reduce any sentence on state and federal cases. Levy met Sean Gunville at a gas station. Gunville and Levy discussed the possibility of sale/purchase of heroin, and Gunville told Levy he knew somebody where he could get it from. Gunville gave Levy his cell phone number. Levy never met [Petitioner] Carl Holt. Levy saw Carl or Charles Holt once, however, he never had any contact with him and was never introduced to him.

For each of the actual purchases of heroin, there were several controlled calls between Gunville and Levy. The controlled calls

were published to the jury. During the initial phone calls, Gunville and Levy discussed the amount and price of the heroin to be sold/purchased, and the location to meet. Levy understood that someone other than Gunville had the heroin and was the one who set the price of the drug. The first sale/purchase between Gunville and Levy was videotaped and published to the jury. Levy purchased 20 grams of heroin from Gunville on July 19, 2012.

During the first purchase, the plan was made for Levy to purchase 3 ounces of heroin from Gunville. Controlled calls between Gunville and Levy to accomplish this planned purchase were introduced and published to the jury. The purchase took place on July 23, 2012. According to Levy, aside from Gunville, there was also another individual present. Levy thought the person was Gunville's supplier because Gunville said that his dude followed him to ensure everything went as planned. The transaction was videotaped and displayed to the jury. Gunville sold Levy three ounces of heroin contained in a red solo cup. Both the heroin and red cup were introduced into evidence.

During the second purchase and while inside Gunville's car, there was an agreement for additional purchase of heroin. The transaction was planned for August 1, 2012, and it was to take place at Kirkland's. Levy met Gunville and purchased three ounces of heroin. Levy denied he purchased additional heroin from Gunville, and specifically denied he robbed Gunville of heroin on August 16, 2012.

Sean Bradley Gunville met [Petitioner] in late 2011. Gunville met [Petitioner] through Joseph Kowalski, a.k.a. "Melon" who was selling heroin from him. "Melon" lived where [Petitioner] lived [i]n a house on Loretto Road. When [Petitioner] moved to Ricky Road, Gunville moved into the Loretto Road place where Melon and Donald and Angie Ross lived. After [] Ross[] moved out Kristopher Harris a.k.a. "Yoda" moved in. "Melon" and "Yoda" and Gunville sold heroin for [Petitioner].

According to Gunville, [Petitioner] kept the heroin at the Ricky Road home but brought it to the Loretto Road [home] when he distributed it to them to sell. [Petitioner] gave the heroin to them up front, they sold it, and brought the money back to him. They got

14

heroin from [Petitioner]. All were daily users of heroin, including [Petitioner]. Gunville knew [Petitioner] obtained the heroin from Ronald Brock. Normally Gunville drove [Petitioner] to get the heroin.

All the people who sold heroin for [Petitioner] used certain coded terms. A small amount was called a "homeboy or soldier." If the amount was half a gram and reached the $100 mark, it was called "little greg," and a gram was called "big greg." The term "boy" meant "heroin." Gunville testified he pled guilty to conspiracy to traffic in heroin as a result of this case and was awaiting sentencing.

Gunville met Levy through a friend. Levy bought heroin from him five or six times. Gunville admitted he sold heroin to Levy on July 19 and 23, and August 1, 2012. [Petitioner] did not accompany Gunville to do the sales per se, however, [Petitioner] followed him in another vehicle, a white Cadillac or a white box Chevy, to make sure everything went down as planned. [Petitioner] encouraged Gunville to sell to Levy, and Gunville testified all the heroin he sold to Levy came from [Petitioner]. [Petitioner] set the price for the heroin and [Petitioner] received all of the money obtained from the sales of heroin.

Gunville attempted to sell more heroin to Levy on August 16, 2012. On that date, Gunville was to sell 5 ounces of heroin but it did not go as planned. Because the amount was larger, [Petitioner] accompanied Gunville and the meeting place was set at Levy's aunt['s] town home complex. [Petitioner] waited in the car while Gunville met Levy. However, according to Gunville, Levy took the heroin from him and Levy's friend took the money for himself. He returned and told [Petitioner] who was very upset. Gunville and [Petitioner] met with Ronald Brock at the CVS parking lot to inform him of the robbery. Brock was upset and wanted his money.

After the robbery, Gunville and [Petitioner] attempted to make up the money owed [to] Brock. "Melon" and "Yoda" sold heroin for [Petitioner] plus Joseph Baker. Baker was the one around [Petitioner] most, and he was the one who usually sold gram amounts for him. That went on until law enforcement raided their home in November[] 2012, and the majority [ ] of them arrested.

15

During cross-examination, Gunville testified he introduced [Petitioner] to Levy when they met at Wacko's in June of 2012. [Petitioner] and Donald were riding with Gunville and he sold Levy seven grams of heroin. According to Gunville, he introduced [Petitioner] to Levy as his heroin supplier. In fact, Gunville testified Levy asked to deal directly with [Petitioner] but [Petitioner] declined and wanted the deals to go through Gunville. Gunville admitted he sold drugs prior to meeting [Petitioner].

Robert Voege worked with the [D]rug [Enforcement] [A]dministration and the Jacksonville Sheriff's Office. Voege assisted with the investigation initially doing surveillance and subsequently working in the intercept room. Voege testified that on July 23 and August 1, 2012, he worked surveillance and saw Gunville leave the Loretto Road home to meet Levy. On July 23rd, after Gunville left, Voege saw [Petitioner] leave in a different car and follow Gunville. Voege saw [Petitioner] pull into the parking lot for the meeting. After the transaction, Voege observed both vehicles leave the meeting area and observed as both arrived at the residence. On August 1st, Voege observed Gunville return[] to the same residence from which he left.

David McMinn worked with the [D]rug [Enforcement] [A]dministration and with the Jacksonville Police Department. McMinn assisted with the surveillance of the meeting between Ronald Brock and Anthony Riley on August 29, 2012. Riley arrived in a maroon Buick and Brock in a maroon Nissan Altima. Riley exited the vehicle and entered Brock's car and stayed inside approximately five minutes. The two left. Likewise, McMinn assisted with the surveillance of a September 5, 2012, meeting between [Petitioner] and Brock. He saw [Petitioner] arrive [i]n his red [F]ord truck and talk to Brock. According to McMinn, during the September 5 meeting [Petitioner] and Brock were not at the area very long. McMinn saw [Petitioner] and Brock go to the front of [Petitioner's] truck, open[] the hood of the truck, talk[] a few minutes, and left.

On November 2, 2012, a search warrant was served on [Petitioner] at the Ricky Drive residence. The search and the surroundings were videotaped/photographed. The photographs and

videotapes were introduced into evidence, and explained to the Jury. Of significance, the photographs showed [Petitioner's] Cadillac and the red pick up truck. In the engine compartment there was a pill bottle with little green baggies with a brown substance later verified to be heroin. The pill bottle was introduced into evidence. [Petitioner] and Joseph Baker, who was present at the home, were arrested.

Deepa Van[M]ali was a senior forensic chemist for the Department of Law Enforcement. VanMali analyzed the drugs purchased during the controlled buys between Gunville and Levy, and later seized after the transactions. All contained a mixture which included heroin with a net weight of 19.6 grams, 65.9 grams, and 83.9 grams. VanMali also analyzed the substance contained in the pill bottle found in the pickup truck during the search of [Petitioner's] home. VanMali testified the substance was heroin with a net weight of 9.5 grams.

Anthony Riley testified he sold heroin to Ronald Brock at a price of $2,000 per ounce starting in February or March of 2012. Brock was purchasing approximately three ounces of heroin per week. Riley pled guilty to trafficking in a controlled substance and was awaiting sentencing at time of trial. Riley never met [Petitioner] and never sold him any drugs. And although he sold drugs to Brock, Riley never knew what Brock did with the drugs.

Officer David Bush worked with the Jacksonville Sheriff's Office. Bush testified that on December 23, 2012, he took a photograph of Ronald Brock sitting inside of a black pick [up] truck during a meeting Brock had with Anthony Riley. Bush saw Brock counting money while []waiting for Riley to arrive. Riley arrived and entered Brock's car. Bush saw Brock hold a green plastic bag, look inside and place it between the car seats or the floorboard. Afterwards, Riley exited Brock's car, got in his vehicle and left. Bush also assisted with the search at [Petitioner's] home. He found no drug evidence inside of the home. Some drug evidence was found in the truck.

Kristopher Harris me[]t [Petitioner] in 2011 when Harris was unemployed and he was doing anything to get money. [Petitioner] asked him to work [o]n his cars. However, afterwards, he worked

17

as a runner for [Petitioner] – he took drugs to people who wanted them and brought the money to [Petitioner]. He ran drugs for [Petitioner] from February to October of 2012, daily. Harris got paid by [Petitioner] with drugs. Harris obtained $20 in drugs for every $100 dollars he ran. Harris also obtained small amounts of drugs for [Petitioner] to give to all the residents to use when there were no drugs in the home because he had other drug connections. He lived in a studio behind [Petitioner's] Loretto [R]oad [home] with Joseph Baker, Sean Gunville and Joseph Kowalski.

Harris testified he was part of [Petitioner's] drug organization which consisted of Joseph Baker, Joseph Kowalski, [and] Sean Gunville. [Petitioner] was the person in charge of the organization. Harris identified the photographs of Baker, a ledger of a customer named Wallace and of others who lived at the home, bags with different amounts of heroin, needles, and items for separating and preparing the heroin for sale. The bags were kept in a lunch box container at the Loretto home.

[Petitioner] called Detective Don Maynard as a witness. Maynard worked for the Jacksonville Sheriff's Office at [the] time of trial and he was the person who initially secured the assistance of the confidential informant used in this case, Jeremiah Levy. Maynard testified that when he arrested Levy he was obtaining large amounts of cocaine from a Miami source and the plan was to use him to get to his source. Koen was part of Maynard's drug investigation involving Levy at the time and when people were arrested, Koen took some of the people who were assisting at the time. Levy was one of the people he took to use.

Levy did not report to Detective Maynard. He testified that once Levy started working with Agent Koen, Maynard had no contact with him. The only information he conveyed to Koen was initially when he told Koen that Levy knew of a heroin source.

. . . .

[T]he jury convicted [Petitioner] as charged, additionally finding that the amount of heroin on count [one] was more than 28 grams. A motion for a new trial was filed and denied. [Petitioner] was adjudicated guilty and he was sentenced as a [H]abitual

> [F]elony [O]ffender to 40 years in prison with a 25 year minimum
> mandatory on [c]ount [one], and to 10 years in prison on [c]ount
> [two], the sentences to be served concurrently.

Resp. Ex. I at 2-16 (record citations omitted).

## IV. The Petition

### a. Ground One

Petitioner asserts that his trial counsel was ineffective for not challenging the state's failure to demonstrate the existence of the conspiracy charged in count one. Doc. 1 at 5. According to him, the state provided no evidence of a conspiracy between Gunville, Brock, and Petitioner; and the charged conspiracy depended on the actions of Levy who was a government agent. Id.

Petitioner raised a version of this claim in grounds one and five of his Florida Rule of Criminal Procedure 3.850 motion filed in state court. Resp. Ex. O at 3-5, 11-14. The trial court summarily denied the claims, finding as follows:

> First, Defendant claims counsel was deficient for failing to
> argue on a motion for judgment of acquittal that a conspiracy could
> not be proven where one of the conspirators was a government
> agent. Specifically, Defendant alleges that DEA Agent Nathan
> Koen used a confidential informant, Jeremiah Levy, to make
> controlled buys of drugs.
>
> > A trial court should not grant a motion for judgment of
> > acquittal unless the evidence, when viewed in a light
> > most favorable to the State, fails to establish a prima
> > facie case of guilt. In moving for a judgment of
> > acquittal, a defendant admits not only the facts stated
> > in the evidence, but also every reasonable conclusion
> > favorable to the State that the fact finder might fairly
> > infer from the evidence. It is the trial judge's task to

> review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences.

State v. Odom, 862 So. 2d 56, 59 (Fla. 2d DCA 2003) [(]citing State v. Williams, 742 So. 2d 509, 510 (Fla. 1st DCA 1999)[)]. Furthermore, to prove counsel was deficient on this claim, Defendant must show that "[he] may very well have prevailed on a more artfully presented motion for acquittal based upon the evidence he alleges was presented against him at trial." Bokin v. State, 725 So. 2d 1203 (Fla. 2d DCA 1999).

"A conspiracy is an express or implied agreement or understanding between two or more persons to commit a criminal offense." Sheriff v. State, 780 So. 2d 920, 922 (Fla. 4th DCA 2001). "It is well-settled that where one of two co-conspirators is a government agent there can be no conspiracy." Id. ([e]mphasis supplied.) Further:

> where two or more persons conspire with another who is, unknown to them, a government agent acting in the line of duty, to commit an offense under an agreement and an intention that an essential ingredient of the offense is to be performed by, and only by, such government agent, such persons may not legally be convicted of a conspiracy.

King v. State, 104 So. 2d 730, 733 (Fla. 1958) ([e]mphasis supplied.) In Tarawneh v. State, 562 So. 2d 770, 772 (Fla. 4th DCA 1990), the Court found the involvement of the government agent irrelevant where the other co-conspirators "were charged and convicted of conspiring with each other."

In this case, Defendant was charged with conspiring to traffic a controlled substance with co-conspirators Sean Gunville and Ronald Brock (count one). In count two, Defendant was charged with conspiring to sell a controlled substance with co-conspirators Kristopher Harris and Jason Baker. Defendant was not charged with conspiring with Jerimiah Levy, who was working as a confidential informant for the DEA. Because this argument was without merit, counsel was not deficient for failing to raise this

issue. See Ferrell v. State, 29 So. 3d 959, 976 (Fla. 2010) ("Trial counsel cannot be deemed ineffective for failing to raise a meritless argument."). Defendant is not entitled to relief on this claim.

. . . .

Next, Defendant claims counsel failed to argue, as part of the defense, that a transaction or agreement between Defendant and Mr. Gunville or Mr. Brock was never proven. Defendant claims only an "association" with Mr. Levy was demonstrated, and at other times Defendant was present but did not participate in any criminal activity. Defendant also claims again that a conspiracy cannot be proven when one of the co-conspirators is a government agent, which is discussed . . . above. Specifically, Defendant refers to a phone call between Mr. Levy and Mr. Gunville, prior to the July 23rd drug buy, where it was apparent Mr. Gunville had someone following him to ensure everything went as planned. Defendant claims his actions do not prove he was part of the conspiracy.

To prove a charge of conspiracy to traffic in a controlled substance, the State must prove the intent to conspire, the intention to commit the offense, and the existence of an agreement. See State v. Kite, 178 So. 3d 98 (Fla. 1st DCA 2015). The elements may be proven by circumstantial evidence. Id.

> To determine whether a single, unified conspiracy exists, courts consider: 1) whether a common goal existed; 2) the nature of the underlying scheme; and 3) the overlap of participants. Where the conspiracy consists of sub-agreements among differing members, the key is to determine whether the different sub-groups are acting in furtherance of one overarching plan. "[E]vidence of an individual participant's understanding of the interdependence of the co-conspirators' activities is evidence - often the best evidence - of tacit agreement between the individual and his co-conspirators." United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999). However, "a conspiracy may be found when the seller understood that the buyer intended to resell the drugs to others." United States v. Roe, 210 F.3d 741, 747 (7th Cir. 2000); see also

21

> United States v. Maseratti, 1 F.3d 330, 336 (5th Cir.
> 1993) ("One becomes a member of a drug conspiracy if
> he knowingly participates in a plan to distribute drugs,
> whether by buying, selling or otherwise.") From that
> point, the conspiracy extends only so far as the co-
> conspirators' agreement and mutual dependence.

> De la Osa v. State, 158 So. 3d 712, 723-724 (Fla. 4th DCA 2015).

> At Defendant's trial, evidence was introduced, specifically the
> testimony of Mr. Gunville and Mr. Harris, demonstrating that the
> co-conspirators had a common goal of selling heroin, with each actor
> making a profit as the heroin moved down the supply chain. The
> sellers of smaller amounts, like Mr. Gunville and Mr. Harris,
> depended on their supplier, Defendant, who in turn depended on
> his supplier, Ronald Brock. As described above, Mr. Gunville
> testified that he was aware that Defendant got the heroin from
> Ronald Brock. Furthermore, Mr. Gunville had told Mr. Levy if he
> sold his remaining supply, he could get more heroin from his
> supplier, demonstrating a situation of mutual dependence.

> Before trial, counsel made motions to exclude Baker, Harris
> and Riley as witnesses, arguing that a lack of evidence existed to
> connect Defendant to these alleged co-conspirators. Defense counsel
> argued repeatedly at trial that the conspiracy was too attenuated.
> On cross-examination of Mr. Levy, counsel highlighted that Mr.
> Levy never bought or sold drugs from Defendant or even spoke to
> him. Similarly, on cross-examination of Anthony Riley, who
> testified that he supplied heroin to Ronald Brock, defense counsel
> confirmed that Mr. Riley never met Defendant or sold him drugs.
> Counsel was not deficient for failing to argue that a conspiracy did
> not exist. Additionally, counsel could not have made a better or
> different argument that would have changed the outcome of the
> proceedings. Therefore, Defendant is not entitled to relief on this
> claim.

Resp. Ex. O at 60-61, 67-68 (record citations omitted). Petitioner appealed, and

the First District Court of Appeal per curiam affirmed the trial court's denial

without a written opinion. Resp. Ex. R.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon review of the record, this Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground One is denied.

### b. Ground Two

Petitioner contends that his trial counsel was ineffective for failing to argue that the evidence lacked the essential elements of two conspiracies because only a "rimless hub" and "spoke" arrangement existed through the state's "pyramiding of assumptions" and "stacked inferences," whereby Ronald Brock acted alone and the other members, including Petitioner, only intended to support their own heroin addiction. Doc. 1 at 6; Doc. 3 at 16; Doc. 38 at 8. According to Petitioner, trial counsel should have argued that the state failed to present sufficient evidence that all the members of the alleged conspiracies had a common goal to sell drugs. Doc. 3 at 16.

Petitioner raised a similar claim in ground three of his Rule 3.850 motion. Resp. Ex. O at 8-9. The trial court summarily denied the claim as follows:

> In this claim, Defendant alleges counsel was deficient for failing to argue [that] Defendant's motion for judgment of acquittal should have been granted due to the State's "pyramiding of

assumptions," and "stacked inferences." Defendant cites parts of the prosecutor's opening statement and closing argument to support his assertion.

"Where two or more inferences in regard to the existence of a criminal act must be drawn from the evidence and then pyramided to prove the crime charged, the evidence lacks the conclusive nature to support a conviction." Edison v. State, 954 So. 2d 1235 (Fla. 2d DCA 2007) (internal citations omitted). However, "the general rule against the pyramiding of inferences is not rigidly applicable in all cases." Benson v. State, 526 So. 2d 948, 952 (Fla. 2d DCA 1988). "[T]he circumstantial evidence test guards against basing a conviction on impermissibly stacked inferences." Miller v. State, 770 So. 2d 1144, 1149 (Fla. 2000). "Circumstantial evidence, by its very nature, is not free from alternate interpretations, and '[t]he State is not required to rebut conclusively every possible variation of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events.'" Evans v. State, 26 So. 3d 85, 90 (Fla. 2d DCA 2010) [(]quoting State v. Allen, 335 So. 2d 823, 826 (Fla. 1976)[)]. Otherwise, "circumstantial evidence would always be inadequate to establish a preliminary showing of the necessary elements of a crime." Allen, 335 So. 2d at 826.

At Defendant's trial, his attorney repeatedly argued that the case was built only on assumptions. Mr. Levy testified that he had bought heroin from Sean Gunville on several occasions, but that he had never bought drugs from Defendant or even spoken to him. However, Mr. Levy also testified that he knew Mr. Gunville was getting the heroin from a supplier and he had seen Defendant on at least two occasions. Additionally, testimony from law enforcement described surveillance placing Defendant and Mr. Gunville together at a house immediately before and after a drug deal with Mr. Levy. Defendant and Mr. Gunville departed the house at the same time to meet Mr. Levy and sell heroin. Defendant was observed driving a separate vehicle and acting as counter-surveillance. Mr. Levy testified that Mr. Gunville had told him, "his dude was following him to make sure everything went okay."

Furthermore, the State introduced numerous intercepted phone calls between Mr. Levy and Mr. Gunville, as well as calls

24

between Defendant and his supplier, Ronald Brock. Although the conversations were vague due to the use of coded language, testimony at trial was offered to explain what many of the terms meant as used between the co-conspirators, relating to the sale of heroin.

Importantly, Mr. Gunville testified at trial, and described how Defendant provided him and others with heroin to sell. Mr. Gunville also testified that he had driven Defendant to purchase heroin from Ronald Brock, which Defendant then provided to Mr. Gunville and others to sell. Mr. Gunville further testified specifically as to the sale of heroin to Mr. Levy on July 23, 2012, when Defendant had been present in another vehicle, acting as counter-surveillance. Kristopher Harris also testified that Defendant supplied him and others with heroin to sell on an ongoing basis for months.

Bearing in mind the standard for considering a motion for judgment of acquittal, as explained above, here, the State had met its threshold burden of establishing a reasonable theory based on competent evidence. See State v. Odom, 862 So. 2d 56, 59 (Fla. 2d DCA 2003). When construing the evidence in the light most favorable to the State, a rational trier of fact could find Defendant guilty of the charges. A motion for judgment of acquittal alleging the State's use of "stacked inferences" would not have been successful. Accordingly, counsel was not deficient for failing to make this argument, and Defendant is not entitled to relief on this claim.

Resp. Ex. O at 62-64 (record citations omitted). Petitioner appealed, and the First DCA per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. R.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon review of the record, this Court concludes that the state court's adjudication of this claim

was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground Two is denied.

### c. Ground Three

Petitioner asserts his trial counsel was ineffective for failing to challenge the lack of probable cause for the wiretap application and for failing to request a <u>Franks</u>[5] hearing. Doc. 1 at 7.

Petitioner raised a similar claim in ground fourteen of his Rule 3.850 motion. Resp. Ex. O at 37-40. The trial court summarily denied the claim as follows:

> Next, Defendant contends counsel was deficient for failing to make a motion to suppress the wiretap. Specifically, Defendant alleges that Agent Koen made false statements to establish probable cause for the wiretap.
>
> At a pre-trial motions hearing held on October 23, 2014, defense counsel noted that Defendant wanted her to file a motion to suppress the wiretap, but she stated that, in her professional opinion, she had no valid basis for such a motion. Counsel candidly stated that probable cause existed for the wiretap. However, counsel further stated that she had attempted to locate some records at Defendant's request to investigate the basis for the wiretap, but the records could not be obtained. Then, the Court allowed Defendant to argue his own motion to suppress. The Court subsequently denied Defendant's motion to suppress.
>
> The record conclusively demonstrates that counsel did not

---

[5] <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

> believe a motion to suppress the wiretap was warranted. Indeed, Defendant's motion on this basis was denied. Therefore, counsel cannot be found deficient for failing to file such a motion and Defendant is not entitled to relief on this claim.

Resp. Ex. O at 78-79 (record citations omitted). Petitioner appealed, and the First DCA per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. R.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Court notes that "federal courts must defer to state law on the question of the validity of wiretap orders obtained by state law enforcement officers in state courts." United States v. Glinton, 154 F.3d 1245, 1252-53 (11th Cir. 1998). Because the wiretap application was made by the state and approved by a Florida circuit court judge, Florida state law governs the admissibility of the wiretap evidence. See United States v. Johnson, 281 F. App'x 909, 912 (11th Cir. 2008).[6] As such, upon review of the record, this Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts

---

[6] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

in light of the evidence presented in the state court proceedings. Ground Three is denied.

### d. Ground Four

Petitioner argues that trial counsel was ineffective for failing to properly challenge and move to suppress the "hearsay" phone conversation between Ronald Brock and Anthony Riley, which occurred after the date of the charged conspiracy in count one. Doc. 1 at 9. Petitioner admits this claim is unexhausted and procedurally barred. Id. But he seeks to overcome this procedural default by relying on Martinez, 566 U.S. at 1, and arguing that he can show "cause" to excuse his default because he did not have counsel when he filed his Rule 3.850 motion. Doc. 1 at 9.

Under Martinez, Petitioner must prove more than the general assertion that the trial court did not appoint counsel in the initial-review collateral proceeding. 566 U.S. at 14. Petitioner must "also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." Id. (citations omitted); see also Lambrix v. Sec'y Fla. Dep't of Corr., 851 F.3d 1158, 1164 (11th Cir. 2017). On the other hand, his claim is "insubstantial" if "it does not have any merit or . . . is wholly without factual support." Id. at 16. For the reasons below, the Court finds that even if Petitioner shows that his

28

lack of postconviction counsel caused his procedural default, he cannot show that his underlying ineffective assistance of counsel claim is substantial.

During his direct appeal, Petitioner, with help from appellate counsel, raised a claim that the trial court erred in allowing the state to introduce this alleged hearsay evidence. Resp. Ex. I at 28 ("The trial court erred when it allowed the state to introduce Riley's hearsay statements without first proving that he was part of a conspiracy and that he made the statements in furtherance of the conspiracy; and, the trial court erred when it allowed Riley to testify that he sold heroin to Ronald Brock because that evidence was irrelevant to prove that [Petitioner] conspired with Gunville and Brock to sell heroin."). In response, the state argued, inter alia, that the claim lacked merit:[7]

> The crime of conspiracy consists of an express or implied agreement between two or more persons to commit any criminal offense. § 777.03(3), Fla. Stat. (1995). The existence of an agreement to support a charge of conspiracy may be shown circumstantially. Manner v. State, 387 So. 2d 1014 (Fla. 4th DCA 1980). Once the State meets its initial burden of showing participation in a

---

[7] In its answer brief on direct appeal, the state also argued that Petitioner failed to preserve all issues raised on appeal as well as an alternative merits argument for each issue. See Resp. Ex. J. But because the First DCA affirmed Petitioner's judgment and conviction without a written opinion explaining its reasons for affirmance, and the state does not rebut any assumption that the First DCA adjudicated the merits of Petitioner's claims, this Court must presume that the First DCA adjudicated all direct appeal issues on the merits. See Sanchez v. Jones, No. 3:14cv249/LAC/EMT, 2015 WL 7820635, at *10 (N.D. Fla. Nov. 2, 2015 ("When, as here, a state court issues an order that summarily rejects without discussion all the claims raised by a defendant , . . . the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary."), rep & recommendation adopted by 2015 WL 7863190, at *1 (N.D. Fla. Dec. 3, 2015).

conspiracy, the weight of that evidence must be determined by the jury. <u>State v. Spioch</u>, 706 So. 2d 32 (Fla. 5th DCA 1998). The State's burden is satisfied where it provides evidence of an express or implied agreement or understanding between two or more people to purchase/sell/deliver/manufacture/etc. the proscribed quantity. <u>State v. Kite</u>, 178 So. 3d 98, 100-01 (Fla. 1st DCA 2015).

Here, the evidence showed that Riley, a high end supplier, supplied Brock with drugs, who in turn supplied [Petitioner] who then provided his gang of low level sellers with small amounts of drugs to sell. The record clearly supports an understanding amongst the parties that this was what was to occur and did occur. Therefore, the elements of conspiracy were met and the hearsay statements were also properly admitted.

Furthermore, [Petitioner] used this evidence to his own advantage, arguing motive to testify and fabricate. For all of these reasons, the State submits this Court should affirm.

Resp. Ex. J at 15-16. Petitioner declined to file a reply brief, and the First DCA affirmed Petitioner's convictions and sentences without a written opinion. Resp. Ex. K.

Here, Petitioner seeks to raise the same claim couched in terms of ineffective assistance of counsel. But "although 'the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension,' we 'must defer to the state's construction of its own law' when the validity of the claim that [trial] counsel failed to raise turns on state law." <u>Pinkney v. Sec'y, DOC</u>, 876 F.3d 1290, 1295 (11th Cir. 2017) (citation omitted). Notably, "[a]s a general rule, a federal court in a habeas corpus case will not review the trial court's actions concerning the

admissibility of evidence," because the state court "has wide discretion in determining whether to admit evidence at trial[.]" <u>Alderman v. Zant</u>, 22 F.3d 1541, 1555 (11th Cir. 1994); <u>see also</u> <u>Baxter v. Thomas</u>, 45 F.3d 1501, 1509 (11th Cir. 1985) (federal habeas corpus is not the proper vehicle to correct evidentiary rulings); <u>Boykins v. Wainwright</u>, 737 F.2d 1539, 1543 (11th Cir. 1984) (federal courts are not empowered to correct erroneous evidentiary rulings in state court unless rulings deny the petitioner fundamental constitutional protections).

Here, Petitioner's claim of ineffective assistance of counsel turns on whether this evidence was admissible under Florida law. On direct appeal, the state court found no error in admitting this evidence, and this Court is without power to find that admission of this evidence violates state evidentiary rules. Also, even if trial counsel objected, and this alleged hearsay testimony was excluded, Petitioner fails to demonstrate a reasonable probability exists that the outcome of his trial would have been different considering the totality of the evidence presented at trial. As such, Petitioner's <u>Strickland</u> claim is insubstantial, and <u>Martinez</u> does not excuse his default. Likewise, Petitioner has not demonstrated that failure to consider this claim on the merits will result in a fundamental miscarriage of justice. Ground Four is denied.

### e. Ground Five

Petitioner contends his trial counsel was ineffective for failing to fully object to or suppress the August 29, 2012, recordings of the phone calls between

Brock and Petitioner because the state relied on that later, after-the-fact irrelevant evidence to prove the earlier, completed conspiracy charged in count one; and where "its objectives had already been met at the July 23, 2012 controlled buy." Doc. 1 at 10. According to Petitioner, the state introduced the phone calls during Detective Koen's testimony who identified Brock's voice on the August 29, 2012, phone call. Doc. 3 at 35. But Petitioner maintains that Koen was not qualified to testify to the identity of Brock's voice and the state otherwise failed to first provide an adequate predicate to establish Brock's identity. Id. Petitioner contends that if trial counsel properly objected, the evidence would have been excluded, and he would have been acquitted of count one. Id. at 37.

Petitioner concedes that this claim is unexhausted and again seeks to overcome any procedural default under Martinez. Doc. 1 at 11. But, for the reasons below, the Court finds that even if Petitioner shows that his lack of postconviction counsel caused his procedural default, he cannot show that his underlying ineffective assistance of counsel claim is substantial to establish prejudice under Martinez.

Petitioner acknowledges that this claim is "partially a recast" of a claim he, with help from appellate counsel, raised on direct appeal. Doc. 38 at 25; see also Resp. Ex. I at 31-35. In its answer brief, the state argued, inter alia, that the claim was without merit:

This case differs significantly from <u>Evans v. State</u>, 177 So. 3d 1219 (Fla. 2015) relied upon by [Petitioner]. There, Evans, objected, contending that it was inappropriate to permit the lead detective to testify to offer an opinion identifying the defendant on jail phone calls which he asserted would invade the province of the jury because he was not a family member or close friend who had spoken with Evans in the past. The trial court overruled the objection, stating the comparison was a known voice exemplar and a jail call which the jury could also do. It was his own opinion and the State was not qualifying him as some sort of expert. The trial court also stated that the voice identification would not be prejudicial because identifications of Evans as the voice on the call-back recording had been made by other witnesses. Here, as previously stated, no such objections were made. Furthermore, Koen testified that he had prior experience with the voices he heard. Significantly, the jury was instructed that it was not to give the testimony of law enforcement greater weight than that of any other witness merely because of that individual's position.

Resp. Ex. J at 13-14 (record citations omitted). Petitioner declined to file a reply brief, and the First DCA affirmed Petitioner's convictions and sentences without a written opinion. Resp. Ex. K.

Again, on direct appeal, the state court found no error in admitting this evidence, and this Court is without power to find that admission of this evidence violates state evidentiary rules. In any event, count one of the second amended information charged Petitioner with conspiring with Gunville and Brock to sell heroin. Resp. Ex. C at 134. At trial, the state introduced evidence of several sales that Petitioner participated in, and the August 29, 2012, phone call may have mentioned a prior drug transaction, but the phone call also provided evidence of Petitioner and Brock conspiring to conduct another, separate sale.

33

Id. at 128. Koen was familiar with Brock's voice and the evidence was relevant to prove all the elements charged in count one. As such, Petitioner's Strickland claim is insubstantial, and Martinez does not excuse his default. Likewise, Petitioner does not demonstrate that failure to consider this claim on the merits will result in a fundamental miscarriage of justice. Ground Five is denied.

**f. Ground Six**

Petitioner alleges his trial counsel was ineffective for failing to seek suppression of Levy's trial testimony and evidence of his controlled drug purchases because Levy, the government informant, was an unreliable witness. Doc. 1 at 12.

Petitioner raised a similar claim in ground seven of his Rule 3.850 motion. Resp. Ex. O at 17-19. The trial court summarily denied the claim as follows:

> Here, Defendant claims counsel failed to adequately impeach the confidential informant, Mr. Levy, and failed to object to the admissibility of the drug evidence based on Mr. Levy's unreliability. Defendant notes Mr. Gunville testified at trial that Mr. Levy had robbed Mr. Gunville of a large quantity of heroin. Agent Koen testified that he was aware of the allegation of a robbery and Mr. Levy's possible involvement. Defendant concludes this robbery, along with other unauthorized drug transactions by Mr. Levy, demonstrate government misconduct for failure to properly train and supervise Mr. Levy as a confidential informant. Defendant further contends Mr. Levy was eventually charged with trafficking in federal court for, "making deals on his own," while he was working as a confidential informant. Therefore, Defendant claims counsel should have argued Mr. Levy was an unreliable witness and the drugs should have been inadmissible.
>
> Before trial, defense counsel argued Mr. Levy's unreliability

34

was a crucial part of the case, and successfully argued against the
State's motion in limine to keep out any reference to the robbery at
trial. Additionally, defense counsel argued repeatedly throughout
trial that Mr. Levy was an unreliable witness. She spoke at length
in her opening statement about Mr. Levy's selfish motives; how he
made unauthorized drug buys; and how the protocols for
confidential informants were not followed by law enforcement.
Counsel cross-examined Mr. Levy about his pending federal
trafficking charges which arose from him doing unauthorized drug
buys while acting as a confidential informant. Counsel cross-
examined Agent Koen and Detective Maynard on the management
of Mr. Levy as a confidential informant. In her closing argument,
counsel again attacked Mr. Levy's reliability.

The unreliability of Mr. Levy as a witness was not a basis for
the Court to find that the drug evidence was inadmissible. Instead,
as counsel argued, the jury could consider how his unreliability
[a]ffected the weight of the evidence. Counsel was not deficient for
failing to challenge the admissibility of the evidence based on Mr.
Levy's unreliability because it would not have been a successful
argument. Defendant is not entitled to relief on this claim.

Resp. Ex. O at 69-70 (record citations omitted). Petitioner appealed, and the

First DCA per curiam affirmed the trial court's denial without a written

opinion. Resp. Ex. R.

The Court addresses this claim in accordance with the deferential

standard for federal court review of state court adjudications. Upon review of

the record, this Court concludes that the state court's adjudication of this claim

was not contrary to clearly established federal law, did not involve an

unreasonable application of clearly established federal law, and was not based

on an unreasonable determination of the facts in light of the evidence presented

in the state court proceedings. Ground Six is denied.

### g. Ground Seven

Petitioner contends that his trial counsel was ineffective for failing to properly object to the improper joinder of count one and count two for a single trial. Doc. 1 at 13. This error allowed the state to "pyramid evidence" for count one and ensure a conviction for count two. Id. at 14.

Petitioner raised this claim in his Rule 3.850 motion. Resp. Ex. O at 22. The trial court summarily denied the claim as follows:

> In this ground, Defendant again claims that the consolidation of the charges created a "pyramid of evidence," as he alleged in Ground Two. In this claim, Defendant claims counsel was deficient for failing to object to the consolidation of the charges. Defendant states that the charges had no connection to each other and were only used to bolster the insufficient evidence in the individual charges. Defendant avers that if he had been tried on the charges separately, he would have been acquitted. Defendant also discusses the allegedly improper use of evidence after a search of his residences ("the Loretto Road house" and "the Ricky Drive house.") Defendant's claims relating to the impropriety of the searches is discussed in Ground Twelve, below.
>
> As conceded by Defendant, counsel objected to the consolidation of charges. In the Court's order granting the State's Motion for Joinder, the Court explained that the defense had argued "joining count 2, a different crime with different co-conspirators, would simply bolster the evidence as to count 1." The Court rejected that argument. Counsel could not have made any different argument that would have changed the ruling. Defendant is not entitled to relief on this claim.

Resp. Ex. O at 72 (record citations omitted). Petitioner appealed, and the First DCA per curiam affirmed without a written opinion. Resp. Ex. R.

Respondents argue that this claim is unexhausted because Petitioner did not brief it during his postconviction appeal. Resp. at 54. There are two unpublished Eleventh Circuit cases finding that a petitioner who chooses to file a brief in an appeal of the summary denial of a Rule 3.850 motion does not waive any issues not addressed in the brief. See Cortes v. Gladish, 216 F. App'x 897 (11th Cir. 2007); Darity v. Sec'y, Dep't of Corr., 244 F. App'x 982, 984 (11th Cir. 2007). But both of those cases rely on Webb v. State, 757 So. 2d 608 (Fla. 5th DCA 2000), from which the Fifth DCA has since receded. See Ward v. State, 19 So. 3d 1060, 1061 (Fla. 5th DCA 2009) (explicitly receding from Webb and finding issues not raised in an appellant's brief following a summary denial of a postconviction motion were abandoned); see also Hastings v. State, 388 So. 3d 1145, 1147 (Fla. 5th DCA 2024) (affirming summary denial of a ground because the appellant "did not address it at all in her brief"). Thus, while the Eleventh Circuit has not yet spoken on Florida's Fifth DCA's recession from Webb, this Court declines to find the Eleventh Circuit's unpublished opinions in Cortes and Darity persuasive. And because Petitioner failed to brief this claim during his postconviction appeal, this claim is procedurally defaulted for federal habeas purposes. See generally Resp. Ex. P.

Petitioner concedes he failed to exhaust this claim but relies on Martinez to excuse his procedural default. Doc. 1 at 14. Nevertheless, the Court finds that Petitioner cannot demonstrate deficient performance under Strickland to

overcome the purviews of the procedural bar. Indeed, as the trial court noted in

its order denying Petitioner's Rule 3.850 motion, trial counsel did object to the

state's request for joinder, and Petitioner has failed to allege or show that any

expansion of trial counsel's objection would have affected the trial court's ruling.

Also, on direct appeal, with the help of appellate counsel, Petitioner argued that

the trial court erred in allowing the state to join counts one and two for trial.

Resp. Ex. I at 18. In response, the state argued, inter alia, that the claim lacked

merit:

> Florida Rule of Criminal Procedure 3.150, provides that with regard to joinder of offenses, "[t]wo or more offenses that are triable in the same court may be charged in the same indictment or information in a separate count for each offense, when the offenses, whether felonies or misdemeanors, or both, are based on the same act or transaction or on 2 or more connected acts or transactions. The primary purpose of requiring separate trials on unconnected charges is to assure that evidence adduced on one charge will not be misused to dispel doubts on the other, and cause a mutual contamination of the jury's consideration of each distinct charge. Floyd v. State, 569 So. 2d 1225 (Fla. 1990).

> In Gudinas v. State, 693 So. 2d 953 (Fla. 1997), the Florida Supreme Court discussed its holding in Ellis v. State, 622 So. 2d 991 (Fla. 1993), wherein the Court surveyed a number of cases, including, Wright v. State, 586 So. 2d 1024 (Fla. 1991); Crossley v. State, 596 So. 2d 447, 450 (Fla. 1992); Bundy v. State, 455 So. 2d 330 (Fla. 1984); and Fotopoulos v. State, 608 So. 2d 784 (Fla. 1992), interpreting joinder based on "two or more connected acts or transactions" within the meaning of the rule. The Gudinas Court, quoting Ellis, held:

> > First, for joinder to be appropriate the crimes in question must be linked in some significant way. This can include the fact that they occurred during a "spree"

> interrupted by no significant period of respite, <u>Bundy</u>,
> or the fact that one crime is causally related to the
> other, even though there may have been a significant
> lapse of time. <u>Fotopoulos</u>. But the mere fact of a general
> temporal and geographic proximity is not sufficient in
> itself to justify joinder except to the extent that it helps
> prove a proper and significant link between the crimes.
> <u>Crossley</u>. <u>Ellis</u>, 622 So. 2d at 1000.

<u>Gudinas v. State</u>, 693 So. 2d at 959-961 (internal footnotes omitted).

Based upon this principle of law, the Court concluded that Gudinas' three separate, unsuccessful attempts to break into the first victim's car after following her from the other parking lot within no more than three hours and in the same proximate area as the rape and murder of the second victim, provided a causal link between the crimes, thus allowing joinder under <u>Fotopoulos</u>. The Court further noted that even if the charges should have been severed, any error would be harmless beyond a reasonable doubt because the testimony still would have been admissible in a severed trial for the second attack as similar fact evidence in establishing Gudinas' motive. Charles N. Ehrhardt, Florida Evidence § 404.14 (1995 Ed.).

Here, the facts of this case satisfy the requirements of joinder of offenses. The offenses charged are triable before the same court and are based upon the same acts or transactions. The offenses were part of a common plan or scheme. The same witnesses would testify in each of the cases and the same evidence would be relied upon. The co-defendants in count I were engaged in the same criminal conspiracy as those listed in count II, the sole factual difference being the weight of the heroin involved in the conspiracy.

The fact that all of the parties to the conspiracies did not have close associations is irrelevant. That is simply not how drug conspiracies work. They are like spider webs where layers build upon layers and edges run off by themselves as supports for the whole design.

Gunville was connected to [Petitioner] who had his own group of low level player[s] selling small amounts that he provided to

them at a profit. Gunville knew that [Petitioner's] immediate supplier was Brock. Gunville also knew the line of supply did not stop with Brock. Gunville was well aware that [Petitioner's] supplier was extremely angry when the drugs were stolen and that [Petitioner's] supplier, Riley, expected [Petitioner] to make repayment and, in turn, [Petitioner] was passing the loss down to Gunville. [Petitioner] was also introduced to Riley in the course of a phone call with Brock. Koen was also able to identify Riley by voice due to the calls. Koen was tendered and accepted as an expert in drug investigations.

Gunville testified that while he never met [Petitioner], Levy told him that he was getting the heroin he would supply Gunville with from someone Gunville knew. The July 19th call contained language relating to the price set by the person Gunville was getting the drug from. Levy testified, without objection, that he thought the person Gunville was getting the drugs from was present at the July 23rd drug deal as depicted in the video. He also believed he saw [Petitioner] for the first time outside a club called Wacko's sitting in a car that Gunville was driving. It was coincidence, unrelated to any drug tran[s]action.

Gunville told Levy that his "guy" was in the parking lot to make sure everything went smoothly. There was supposed to be [] another deal with Levy for five ounces on the 23rd when he saw the guy again.

<u>Harmless Error</u>

Finally, assuming arguendo that the trial court erred in denying the motion, the facts surrounding the crimes were so similar, interwoven and connected with one another, any error in admitting this evidence was harmless beyond a reasonable doubt. In <u>Gudinas v. State</u>, <u>supra</u>, the Florida Supreme Court held that even where the charges should have been severed, any error would be subject to a harmless review under the standard enunciated in <u>State v. DiGuilo</u>, 491 So. 2d 1129 (Fla. 1986)[,] where the evidence would have been admissible for other purposes. Finding that the evidence introduced against Gudinas would have also been admissible as similar fact evidence, the Court concluded:

40

> [f]urthermore, we agree with the State that even if the charges should have been severed, any error would be harmless beyond a reasonable doubt. <u>State v. DiGuilio</u>, 491 So. 2d 1129 (Fla. 1986). Rachelle Smith's testimony still would have been admissible in a severed trial for the McGrath attack as similar fact evidence in establishing Gudinas' motive for raping and murdering Michelle McGrath. Charles W. Ehrhardt, Florida Evidence § 404.14 (1995 ed.).

<u>Gudinas v. State</u>, 693 So. 2d at 960-961.

> In this case, the common links between the crimes and the facts and circumstances surrounding each crime, would be relevant, material and competent evidence in the trial of the other and therefore would be lawfully and necessarily made known to the jury as both similar fact evidence and inextricably intertwined evidence. Moreover, even if the charges had been severed, the evidence relating to one crime was also relevant and admissible "to establish the entire context out of which the crime arose." <u>Spencer v. State</u>, 645 So. 2d 377, 382 (Fla. 1994). Accordingly, if error occurred in this case, it was harmless.

Resp. Ex. J at 8-13 (record citations omitted).

The First DCA affirmed Petitioner's judgment and convictions without a written opinion. Resp. Ex. K. And Petitioner's attempt to recast this claim as one of ineffective assistance of counsel is without merit. Thus, upon review of the record, this Court concludes Petitioner's <u>Strickland</u> claim is insubstantial, and <u>Martinez</u> does not excuse his default. Likewise, Petitioner has not demonstrated that failure to consider this claim on the merits will result in a fundamental miscarriage of justice. Ground Seven is denied.

### h. Ground Eight

Petitioner alleges that his trial counsel was ineffective for failing to timely correct Petitioner's written judgment. Doc. 1 at 15. Notably, Petitioner argues that after announcing his sentence and excusing trial counsel, the state advised the trial court that it forgot to impose the required HFO twenty-five-year minimum mandatory sentence to count one. Doc. 3 at 49. In response, the trial court brought Petitioner back into the courtroom without counsel and imposed the minimum mandatory term. Id. Petitioner contends trial counsel's failure to discover the discrepancy between the trial court's oral pronouncement and written sentencing order within thirty days of sentencing violated his Sixth and Fourteenth Amendment rights. Id. at 50. According to Petitioner, but for trial counsel's failure to detect the error, there is a probability the trial court would have conformed the written judgment and sentence to the original oral pronouncement, and he would have received a more lenient sentence on count one. Id.

Petitioner maintains that he failed to exhaust this ineffective assistance of counsel claim but seeks to overcome any procedural bar under Martinez. Doc. 1 at 15. Nevertheless, the Court finds this claim insubstantial. Notably, Petitioner's current ineffective assistance of counsel claim turns on the contention that if trial counsel later discovered the inclusion of the minimum mandatory sentence in the written judgment and sentence, the trial court would

42

have been required to omit that term because it did not orally pronounce it when imposing his sentence for count one. But Petitioner cannot demonstrate a reasonable probability that the result of the proceedings would have been different if trial counsel detected and objected to this alleged error.

For example, in <u>Dunbar v. State</u>, 89 So. 3d 901, 906 (Fla. 2012), the trial court initially pronounced a sentence it had no discretion to impose, realized its error later that day, and added the nondiscretionary mandatory minimum terms to the sentence. The Florida Supreme Court held that the trial court's later addition of the mandatory minimum term on the same day as oral pronouncement did not violate double jeopardy principles because under Florida law, "[w]hen a trial court fails to pronounce nondiscretionary sentencing terms, the defendant has no legitimate expectation in the finality of that sentence, at least until the reviewing court has issued a mandate or the time for filing an appeal has run." <u>Id.</u> at 906-07.

Likewise, here, the trial court did not have the discretion to impose a sentence on count one that omitted the required HFO minimum mandatory term. Consequently, if trial counsel argued that the mandatory minimum term imposed later that day, after the sentencing hearing, and without her presence violated Petitioner's constitutional rights, the argument likely would have been rejected, and thus Petitioner cannot demonstrate prejudice for counsel's failure to raise the issue. <u>See</u> <u>Moss v. Sec'y, Fla. Dep't of Corr.</u>, No. 3:19-cv-881-MMH-

JBT, 2022 WL 1321149, at *12 (M.D. Fla. May 3, 2022) (finding the defendant's constitutional rights were not violated when the trial court resentenced the defendant to include a mandatory minimum before "the expiration of the time to file an appeal" (citing <u>Dunbar</u>, 89 So. 3d at 906)). As such, Petitioner's <u>Strickland</u> claim is insubstantial, and <u>Martinez</u> does not excuse his default. Similarly, Petitioner has not demonstrated that failure to consider this claim on the merits will result in a fundamental miscarriage of justice. Ground Eight is denied.

## V. <u>Supplemental Petition</u>

### i. Grounds Nine, Ten, Eleven, Twelve, Thirteen, and Fourteen

In Petitioner's Supplemental Petition, he raises six additional claims for relief, all of which are based on allegations of trial court error or prosecutorial misconduct. <u>See generally</u> Doc. 28. He contends the trial court erred in imposing the twenty-five minimum mandatory term without trial counsel present (Ground Nine); the trial court erred in not allowing Petitioner to speak on his behalf during the sentencing hearing (Ground Ten); his judgment and convictions are "void" because Agent Koen committed fraud on the trial court when he falsified the probable cause for the wiretap affidavit (Ground Eleven); his judgment and convictions are "void" because the prosecutor illegally amended the charging document and the trial court erred in adjudicating guilt and imposing a sentence where the amended information was not a viable

44

charging document (Ground Twelve); Petitioner's judgment and convictions are "void" because the state and trial court violated Petitioner's speedy trial rights by failing to try Petitioner within 175 days of the amended information (Ground Thirteen); and his judgment and conviction on count one is "void" because the trial court at sentencing erroneously stated that the conviction for count one was for conspiracy to traffic cocaine rather than heroin and the judgment on count two is "void" because the trial court failed to pronounce during sentencing the offense he was convicted of on count two (Ground Fourteen). See generally Doc. 28; see also Doc. 29 at 41-50.

Respondents argue that all the claims in the Supplemental Petition are untimely because they do not relate back to any claim timely raised in the original Petition. Doc. 31 at 60-63. They also assert that even if the claims in Grounds Twelve through Fourteen are timely filed, they must still be dismissed as unexhausted and procedurally barred because Petitioner voluntarily dismissed his appeal of the trial court's order disposing of those claims. Id. at 63.

Petitioner contends that the claims in his Supplemental Petition are timely filed because his original Petition is timely filed, and the Court stayed this case and held it in abeyance while Petitioner filed a postconviction motion in state court containing the claims in the Supplemental Petition. Doc. 38 at 45 ("Because Petitioner's original [] Petition was timely filed, the AEDPA's one-

year time limit rule does not deprive this [C]ourt of its authority to issue stays that are a proper exercise of the [C]ourt's discretion, nor does the rule restrict that discretion."). He also asserts the claims in his Supplemental Petition are "related to" Ground Eight of his original Petition. Id. at 44-45. And he seems to argue that his claims in Ground Nine, Ground Ten, and Ground Fourteen are exhausted because he raised those claims in his state court Rule 3.800(a) motion. See generally id. Petitioner declined to reply to Respondents' arguments about Grounds Eleven, Twelve, and Thirteen. Id. at 53-54.

The AEDPA amended 28 U.S.C. § 2244 by adding the following subsection:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of--
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

46

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Here, Petitioner's judgment and sentence became final on May 25, 2017, ninety days after the First DCA denied his motion for rehearing on direct appeal. Resp. Ex. L. However, his one-year limitations period did not begin to run because it was tolled on May 3, 2017, when Petitioner filed with the First DCA a petition alleging ineffective assistance of appellate counsel. Resp. Ex. M. On June 6, 2017, the First DCA denied the petition, and Petitioner's one-year began to run the next day, June 7, 2017. See Resp. Ex. N. His limitations period ran for 121 days until it was tolled on October 5, 2017, when Petitioner filed

with the trial court his Rule 3.850 motion. Resp. Ex. O at 5-50. The trial court

denied the Rule 3.850 motion on August 15, 2018 (id. at 63-86), and the First

DCA issued its mandate affirming the trial court's denial on April 22, 2019

(Resp. Ex. R). Petitioner's one-year began to run again the next day, April 23,

2019. Petitioner then filed the original Petition on November 14, 2019, day 326

of his one-year limitations period. Doc. 1. Petitioner's one-year expired 36 days

later, on December 23, 2019, without Petitioner filing with the state court

another tolling motion.[8]

Contrary to Petitioner's argument, Petitioner's timely filed original

Petition did not toll his one-year AEDPA statute of limitations. See Duncan v.

Walker, 533 U.S. 167, 181-82 (2001) (holding that an application for federal

habeas corpus review is not an "application for State post-conviction or other

collateral review" under § 2244(d)(2) and therefore does not toll the limitation

period). And the Court's decision to stay this action, upon Petitioner's request,

so he could pursue new postconviction remedies in state court also did not toll

his one-year period. See, e.g., Casey v. Sec'y, Dep't of Corr., No. 2:16-cv-821-

JES-MRM, 2022 WL 819976, *6 n.10 (M.D. Fla. Mar. 18, 2022) (noting that

because the Supreme Court has expressly determined that an application for

---

[8] The 39th day fell on Saturday, December 21, 2019, so Petitioner had until
Monday, December 23, 2019, to file his federal habeas Petition or another properly-
filed tolling motion.

federal habeas corpus review is not a tolling motion under § 2244(d)(2), the court's decision to stay a federal habeas action does not affect the calculation of the one-year statute of limitation).[9] Thus, Grounds Nine through Fourteen of the Supplemental Petition are time-barred unless those claims "relate back" to the claims in Petitioner's original Petition.

Federal habeas petitions are civil in nature and are governed by the Federal Rules of Civil Procedure. See Habeas Corpus Rule 11; Fed. R. Civ. P. 81(a)(4). As such, a habeas petition may be amended as provided in the rules of procedure applicable to civil actions. See 28 U.S.C. § 2242. Under the Federal Rules of Civil Procedure, pleading amendments relate back to the date of the original pleading when "the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading" Fed. R. Civ. P. 15(c)(2). An amendment to a habeas petition may relate back "[s]o long as the original and amended petitions

---

[9] The Court also notes that even if the Court's order staying this case could toll Petitioner's one-year statute of limitations, the Court granted the motion to stay this action on June 4, 2020, 164 days after the expiration of Petitioner's one-year limitation period. See Doc. 10. Likewise, the state court postconviction motions Petitioner filed with the trial court after he filed his original Petition and during the stay of these proceedings did not toll Petitioner's one-year because they were also filed after the expiration of his statute of limitations. See Resp. Exs. S, X; see e.g., Sibley v. Culliver, 377 F.3d 1196, 1204 (11th Cir. 2004) (stating "once a deadline has expired, there is nothing left to toll"); Webster v. Moore, 199 F.3d 1256, 1259 (11th Cir. 2000) ("Under § 2244(d)(2), even 'properly filed' state-court petitions must be 'pending' in order to toll the limitations period. A state-court petition like [the petitioner]'s that is filed following the expiration of the limitations period cannot toll that period because there is no period remaining to be tolled.").

state claims that are tied to a common core of operative facts." <u>Mayle v. Felix</u>, 545 U.S. 644, 664 (2005). A new claim, however, does not meet the standard and thus does not relate back "when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." <u>Id.</u> at 650. The terms "conduct, transaction, and occurrence" are to be narrowly construed and are not synonymous with "trial, conviction or sentence." <u>Id.</u> at 664.

At the outset, the claims in the Supplemental Petition present a new theory on which habeas relief can be granted and the core facts of his trial court error and prosecutorial misconduct claims are different in type from the ineffective assistance of counsel claims in his original Petition. Consequently, because ineffective assistance of counsel claims require different analyses and considerations than those of trial court error and prosecutorial misconduct, Grounds Nine through Fourteen do not "relate back" to the ineffective assistance of counsel claims raised in Grounds One through Eight. <u>See, e.g.</u>, <u>Romanes v. Sec'y, Dep't of Corr.</u>, 621 F. Supp. 2d 1249, 1266 (M.D. Fla. 2008) (supplemental claim of ineffective assistance of appellate counsel was distinct from claims of trial court error and ineffective assistance of trial counsel raised in the original petition, and did not relate back); <u>Johnson v. Watson</u>, No. 8:03-cv-2089-T-23-MSS, 2005 WL 1126664, at *2 (M.D. Fla. May 5, 2005) (no relation back where the original petition asserted claims of double jeopardy and

50

sufficiency of the evidence, and amended petition alleged trial counsel was ineffective for failing to raise the double jeopardy issue and other ineffective assistance claims); see also Woods v. United States, No. 08-0737-KD, 2009 WL 3062456, at *5 (S.D. Ala. Sept. 17, 2009) (claim that trial judge committed constitutional error in sentencing did not relate back to claim that counsel was ineffective for failing to prevent the trial judge from using an excessive drug quantity in sentencing); Schneider v. McDaniel, 674 F.3d 1144, 1151 (9th Cir. 2012) (finding that a claim that trial counsel rendered ineffective assistance or that his sentence is disproportionate does not relate back to the claims of trial court error because the "core facts" of these claims are "different in type").

Also, trial counsel's conduct at issue in Grounds One through Eight are distinct in both time and type from his claims of trial court error and prosecutorial misconduct at issue in Grounds Nine through Fourteen. Indeed, most of the claims in the original Petition challenge: trial counsel's failure to seek suppression of evidence during pretrial motion practice or contemporaneously object during trial (Grounds Three, Four, Five, Six, and Seven); trial counsel's conduct following trial but before sentencing (Grounds One and Two); or trial counsel's conduct after sentencing (Ground Eight). On the other hand, the claims in the Supplemental Petition relate to the state's conduct prior to charging Petitioner (Grounds Eleven and Twelve) or relate to the trial court and the state's alleged violation of Petitioner's speedy trial rights

(Ground Thirteen) — a claim or allegation never mentioned in the original Petition.

Also, while Grounds Nine, Ten, Twelve, and Fourteen of the Supplemental Petition relate to events that occurred during sentencing, only Ground Nine (trial court erred in imposing minimum mandatory term without trial counsel present) seemingly involves similar underlying facts as a claim in the original Petition (Ground Eight – trial counsel was ineffective for failing to timely review and correct Petitioner's written judgment and sentence that included the minimum mandatory term and differed from the trial court's oral pronouncement). In his Reply, Petitioner relies on this attenuated similarity, arguing that his Supplemental Petition claims "relate[] to [G]round Eight" of his original Petition. Doc. 38 at 44-45. But, as explained above, Ground Eight is unexhausted and procedurally barred; and thus, no Grounds or claims in the Supplemental Petition can "relate back" to the claim in Ground Eight. See King v. Ryan, 564 F.3d 1133, 1142 (9th Cir. 2009) ("The only sensible interpretation of Mayle is that it requires new claims to relate back to claims properly contained in the original petition—that is, those claims that were exhausted at the time of filing. Only this interpretation of Mayle comports with Duncan's reasoning about the goal of exhaustion in habeas cases.").

As such, Grounds Nine through Fourteen of the Supplemental Petition are untimely and procedurally barred. Petitioner has failed to demonstrate that

he is entitled to equitable tolling or that the fundamental miscarriage of justice
or actual innocence exceptions apply to avoid the time bar here. Thus, these
claims in the Supplemental Petition are due to be dismissed.[10]

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.    The Petition (Doc. 1) is **DENIED**, the Supplemental Petition (Doc.
28) is **DISMISSED with prejudice** as untimely, and this case is **DISMISSED
with prejudice**.

2.    The **Clerk** shall enter judgment dismissing this case with
prejudice, terminate any pending motions, and close the file.

3.    If Petitioner appeals this Order, the Court denies a certificate of
appealability. Because this Court has determined that a certificate of
appealability is not warranted, the Clerk shall terminate from the pending
motions report any motion to proceed on appeal as a pauper that may be filed

---

[10] In any event, even assuming Grounds Nine through Fourteen of the
Supplemental Petition were timely filed, the Court finds those Grounds are without
merit and due to be denied.

in this case. Such termination shall serve as a denial of the motion.[11]

**DONE AND ORDERED** at Jacksonville, Florida, this 25th day of August, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

Jax-7

C:    Carl Earskin Holt, #975195
      Counsel of record

---

[11] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.